JOHN D. D'ERCOLE, ESQ.
(jdd@robinsonbrog.com)
Robinson Brog Leinwand Greene Genovese
     & Gluck P.C.
875 Third Avenue, 9th Floor
New York, New York 10022-0123
(212) 603-6300
*Attorneys for Petitioner*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of the Application of

JOSHUA SASON,

                     Petitioner,

to Quash a Summons issued by

YOSSEF KAHLON a/k/a JOSSEF KAHLON, and
TJ MANAGEMENT GROUP LLC,

                     Respondents.

Docket No.:

**AMENDED NOTICE OF MOTION**



**PLEASE TAKE NOTICE**, that based upon the Petition, the Declaration of Joshua Sason, executed June 10, 2013, the Declaration of David Danovitch, executed June 10, 2013, and the accompanying Memorandum of Law, the petitioner, Joshua Sason, shall move before a United States District Judge presiding over Special Term, Part 1, at the courthouse located at 500 Pearl Street, New York, New York, on July 02, 2013, at 10:00 a.m., pursuant to Rule 45, Fed. R. Civ. P., for an order quashing the Subpoena to Testify at a Deposition on June 26, 2013 at 9:30 a.m. at 210 Fifth Avenue, Suite 401, New York, New York, issued by the respondents and imposing sanctions on the respondents requiring that they pay his reasonable attorney's fees and costs in filing the instant petition and making this motion to quash pursuant to Rule 45 (c)(1) and for such other relief as the Court deems just and proper.

**PLEASE TAKE FURTHER NOTICE**, that pursuant to Rule 6.1 of the Local Civil

Rules of the United States District Court for the Southern District of New York, opposing

affidavits and answering memoranda of law, if any, are required to be served within seven (7)

days after service of the moving papers.

Dated: New York, New York
      June 12, 2013

                      ROBINSON BROG LEINWAND GREENE
                      GENOVESE & GLUCK P.C.

                      By: _____
                              John D. D'Ercole

                      875 Third Avenue, 9th Floor
                      New York, New York 10022
                      (212) 603-6300
                      *Attorneys for Petitioner*

JOHN D. D'ERCOLE, ESQ.
(jdd@robinsonbrog.com)
Robinson Brog Leinwand Greene Genovese
      & Gluck P.C.
875 Third Avenue, 9th Floor
New York, New York 10022-0123
(212) 603-6300
*Attorneys for Petitioner*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of the Application of

JOSHUA SASON,

                           Petitioner,

to Quash a Summons issued by

YOSSEF KAHLON a/k/a JOSSEF KAHLON, and
TJ MANAGEMENT GROUP LLC,

                           Respondents.

Docket No.:

**PETITION TO
QUASH SUBPOENA**

       Petitioner Joshua Sason ("Sason"), by his attorneys, Robinson Brog Leinwand

Greene Genovese & Gluck, P.C., brings this petition against respondents Yoseff Kahlon a/k/a

Jossef Kahlon and TJ Management Group, LLC to quash a Subpoena to Testify at a Deposition

on June 26, 2013 at 9:30 a.m. at 210 Fifth Avenue, Suite 401, New York, New York (the

"Subpoena")(attached hereto as Exhibit A), and alleges as follows:

       1.     Sason is an individual residing in New York, New York and is a principal

of Magna Group, LLC and Magna Group (Texas), LLC (collectively "Magna").

2.     Magna is a company which provides capital to investee companies (both private and public) through numerous structures.  Its portfolio companies are located around the world.

3.     The Court has jurisdiction to entertain this petition to quash pursuant to Rule 45 of the Federal Rules of Civil Procedure.

4.     The Subpoena was issued by respondents in connection with a civil enforcement action commenced against them by the Securities and Exchange Commission pending in the United States District Court for the Eastern District of Texas (the "SEC Action").

5.     The Supboena was allegedly served by the respondents on Sason at 83 Cherry Drive West, Plainview, NY 11803.  This location is neither Sason's residence nor place of business.  Respondents' counsel had previously been advised that Sason neither worked or resided at this location.

6.     Although Sason had been a family friend of Kahlon, neither Sason nor Magna ever had any business relationship with the respondents and do not have any relevant information in connection with the SEC Action.

7.     The SEC Action charges the respondents with an illegal penny stock distribution scheme in which respondents are alleged to have reaped $7.7 million in ill gotten gains by distributing stock of at least eleven companies to the public without proper registration.  The conduct which the respondents are charged with in the SEC Action is alleged by the SEC to constitute violations of Sections 5 (a) and 5 (c) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a) and 77e(c).  A copy of the complaint filed in the SEC Action is attached hereto as Exhibit B.

8.      Respondents commenced a meritless and vexatious action against Sason in the Supreme Court of the State of New York, County of Nassau, captioned *TJ Management Group LLC v. Joshua Sason, Magna Group, LLC, and Magna Group (Texas) LLC*, Index No. 011405/12, alleging that Sason and Magna were responsible for the closing of TJ Management's E*Trade Account. The respondents attempted to assert a claim against Sason for tortious interference with contract and business relationships.

9.      The Nassau County Complaint was dismissed because the court found that it did not assert a cognizable claim against Sason because there was no allegation that Sason "exerted economic pressure, or engaged in any conduct directed at E*Trade, to force it to cease doing business with TJ management." A copy of the court's decision dismissing the complaint is attached hereto as Exhibit C.

10.     The SEC Action is predicated upon the sale by respondents to the public of unregistered stock which has nothing at all to do with any business activity engaged in by Sason through Magna. Neither Sason nor Magna ever purchased securities from or sold securities to any of the respondents or was in any way involved with respondents' alleged distribution of unregistered stock to the public in violation of the securities laws.

11.     Not only was the Subpoena not properly served on Sason, but also Sason has no information possibly relevant to the issues involved in the SEC Action or any information which would lead to the discovery of admissible evidence.

12.     The Subpoena was issued by Kahlon solely for the purpose of harassing Sason and should be quashed because it would cause Sason to suffer an "undue burden.

**WHEREFORE**, petitioner Joshua Sason requests the Court to quash the Subpoena issued by the respondents requiring his attendance at a deposition on June 26, 2013 at 9:30 a.m. at 210 Fifth Avenue, Suite 401, New York, New York and impose sanctions on the respondents requiring that they pay his reasonable attorney's fees and costs in filing the instant petition and making this motion to quash the Subpoena pursuant to Rule 45 (c)(1).

Dated: New York, New York
   June 7, 2013

        ROBINSON BROG LEINWAND GREENE
        GENOVESE & GLUCK P.C.

        By: _____
            John D. D'Ercole

        875 Third Avenue
        New York, New York 10022
        (212) 603-6300
        Attorneys for Petitioner

# EXHIBIT A



UNITED STATES DISTRICT COURT

for the

Eastern District of Texas

Sherman Division

Securities and Exchange Commission )
)
_____ )    Civil Action No. 4:12-CV-517
*Plaintiff* )
Yossef Kablon, a/k/a Jossef Kablon, )
and RY Management Group LLC )    (If the action is pending in another district, state where:
_____ )    District of _____ )
*Defendant* )

SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: JOSHUA SASON, 5 Hanover Square, New York, NY 10004

☒ *Testimony:* YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization that is not a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place | Date and Time |
|-------|---------------|
| 210 Fifth Ave., Suite 401, New York<br>New York | Wed. June 26, 2013 @ 9:30 am |

The deposition will be recorded by this method: audio, real time , other stenographic means

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date: _____

CLERK OF COURT

OR

_____        _____
*Signature of Clerk or Deputy Clerk*                        *Attorney's Signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* _____
_____ , who issues or requests this subpoena, are
THE HELLER LAW FIRM P.C.

## CERTIFICATE OF SERVICE

This is to certify that on May 22, 2013 I electronically filed the foregoing document with the Clerk of court for the U. S. District Court, Eastern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorney of record who has consented in writing to accept this Notice as service of this document by electronic means, and served a copy of the foregoing Notice of Deposition on the person by Federal Express overnight delivery:

Toby M. Galloway
Local Counsel
Texas Bar No. 00790733
801 Cherry Street, 19th Floor
Fort Worth, Texas 76102-6882
Tel.:   (817) 978-6447
Fax:   (817) 978-4927
Email: GallowayT@sec.gov

Timothy Leiman
Lead Attorney
Illinois Bar No. 6270153
175 West Jackson Boulevard, Suite 900
Chicago, Illinois 60604
(312)353-5213
Fax: (312) 353-7398
Email: LeimanT@sec.gov

John E. Birkenheier
Attorney for Plaintiff
Illinois Bar No. 6270993
175 West Jackson Blvd, Suite 900
Chicago, Illinois 60604
Phone: (312) 886-3947
Fax: (312) 353-7398
E-mail: BirkenheierJ@sec.gov

Jonathan Stephen Polish
Attorney for Plaintiff
Illinois Bar No. 6237890
175 West Jackson Blvd, Suite 900
Chicago, Illinois 60604
Phone: (312) 353-8884
Fax: (312) 353-7398
E-mail: PolishJ@sec.gov

Norman H. Heller



Respectfully Submitted,

By: _____

Nathan D. Balin, Esq.
pro hac vice
Counsel to Defendant
The Balin Law Firm, P.C.
3000 Marcus Avenue
Suite 3E4
Lake Success, NY 11042
516.441.5656          Phone
516.441.5400          Fax
nbalin@balinlawfirm.com  Email

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| Securities and Exchange Commission, | : | |
| Plaintiff, | : | Civil Action No.: 4:12-cv-517 |
| | : | |
| v. | : | |
| | : | ECF |
| Yossef Kahlon, a/k/a Jossef Kahlon, and | : | |
| TJ Management Group, LLC, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges:

### SUMMARY

1.     Since at least June 2008, Jossef Kahlon, a/k/a Yossef Kahlon, ("Kahlon") through his corporate entity, TJ Management Group, LLC ("TJM"), (together, the "Defendants") have abused and misused both a federal securities registration exemption and a Texas securities registration exemption to illegally dump billions of shares of penny stock into the public market without registration.  TJM's business model was predicated on acquiring large blocks of stock from small companies in multiple successive transactions at a price of at least 40% less than the prevailing market price and quickly reselling the stock into the public market without registration.  TJM and Kahlon have reaped at least $7.7 million in profits from this illicit penny stock distribution model.

2.     Kahlon, through TJM, employed this model to distribute the stock of at least eleven companies in the public market without registration: My Vintage Baby, Inc., Lecere, Corporation, Landstar, Inc., Hard to Treat Disease, Inc., Good Life China Corporation, VIPR

Industries, Inc., ChromoCure, Inc., Atlantis Internet Group Corp, Biocentric Energy Holdings, Inc., Skybridge Technology Group, Inc., and RMD Entertainment Group, Inc. (collectively, the "Issuers").

3.    Between June 2008 and July 2010, Kahlon, through TJM, served as a conduit of shares from the Issuers to the investing public.

4.    Federal securities law requires that a registration statement be filed with the Commission before a security can be offered for sale, unless the sale of the security qualifies for a statutory exemption from registration. If no registration statement is in effect for a security and no valid statutory exemption applies, the sale of the security violates Sections 5(a) and (c) of the Securities Act of 1933 [15 U.S.C. §§ 77e(a) and 77e(c)] ("Section 5").

5.    The purpose of Section 5 is to protect investors by promoting full disclosure of information thought necessary for informed investment decisions. A registration statement includes disclosures of financial and business information about the company issuing the securities. The registration requirement ensures that investors have access to important information about the issuer before purchasing the security.

6.    Because no registration statements were filed in conjunction with TJM's distributions of the Issuers' shares, prospective investors did not receive important information to which they were legally entitled before deciding whether to buy stock – such as audited financial statements, information about the management's business history, the dilution impact a distribution would have on existing shareholders, and a description of principal risks that could arise and affect the value of the shares.

7.    The Commission seeks a final judgment (a) permanently restraining and enjoining Defendants from violating Section 5; (b) ordering Defendants to disgorge their ill-gotten gains

with prejudgment interest thereon; (c) ordering Defendants to pay civil money penalties, pursuant to Section 20(d) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77t(d)]; and (d) permanently prohibiting Defendants from participating in an offering of penny stock, pursuant to Section 20(g) of the Securities Act of 1933 [15 U.S.C. § 77t(g)].

## JURISDICTION AND VENUE

8.      The Commission brings this action pursuant to the authority conferred upon it by Section 20 of the Securities Act [15 U.S.C. § 77t].

9.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)]. Defendants, directly or indirectly, singly or in concert, have made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in connection with the sale of securities and the transactions, acts, practices and courses of businesses alleged herein.

10.     Venue lies in the Eastern District of Texas pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)]. As described herein, TJM bought and sold securities in unregistered offerings occurring across the United States. Twenty-five such offerings took place, in whole or in part, in McKinney, Texas, where My Vintage Baby, Inc. is based. At Kahlon's direction, agents of TJM contacted officers of My Vintage Baby, Inc. in McKinney, Texas by phone and email to facilitate the sale of shares from My Vintage Baby, Inc. to TJM.

11.     For offerings that occurred outside of Texas, Kahlon and TJM improperly sought to avail themselves of a securities registration exemption of the Texas Securities Act [Tex. Admin. Code, tit. 7 § 109.4(a)].

## FACTS

### Defendants

12.     **Kahlon**, age 46, resides in New York, New York.  Kahlon is the sole owner and managing member of TJM.

13.     **TJ Management Group, LLC** is a New York limited liability company with its principal place of business in New York, New York.

14.     Between 2005 and 2010, TJM has conducted business through a bank account maintained in the state of New York.

15.     TJM has never maintained a bank account in the state of Texas.

16.     TJM has never had any employees in the state of Texas.

17.     In August 2005, TJM registered with the state of Texas as a foreign limited liability company.  Thereafter, TJM focused its business and operations on buying and selling penny stocks in unregistered offerings.

18.     Prior to September 10, 2007, TJM had no physical presence or operations in the state of Texas.

19.     A special warranty deed dated September 10, 2007, provides that Flowerdale LLC, a company owned by Capital TT, LLC, transferred to TJM a parcel of land in Texas for consideration of the sum of ten dollars.  The land that is the subject of the September 10, 2007, special warranty deed is vacant.

20.     Between 2005 and 2010, TJM retained Theodore Flomenhaft ("Flomenhaft") as an independent contractor.  During that time, Flomenhaft resided in the state of New York. Flomenhaft has never been an owner or officer of TJM.

4

21.    Between 2005 and 2010, TJM retained Edward Gurin ("Gurin") as an independent contractor. During that time, Gurin resided in the state of New York. Gurin has never been an owner or officer of TJM.

22.    TJM has never registered with the Commission in any capacity.

### The Illegal Penny Stock Distribution Scheme

23.    From at least June 2008 through July 2010, TJM generated income by purchasing penny stock in unregistered offerings and reselling that stock into the public market without registration. A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Securities Exchange Act of 1934 [17 C.F.R. 240.3a51-1].

24.    Kahlon, through TJM, attempted to disguise many of his transactions as limited seed capital offerings under Texas securities law and Rule 504 of Regulation D of the Securities Act [17 C.F.R. §230.501 et seq. (1999)]. But, instead of legitimate offerings to accredited investors pursuant to Regulation D and Texas law, Kahlon engaged in a large scale effort to funnel his shares to the public without registration.

25.    Between June 2008 and July 2010, TJM bought and sold the stock of companies whose share price was quoted on OTC-Link ("Pink Sheets"), a private electronic inter-dealer quotation and trading system used in the over-the-counter market. Penny stocks may be quoted on the Pink Sheets without having a periodic reporting statement filed with the Commission.

26.    Between June 2008 and July 2010, Kahlon, or those acting at his direction, searched the internet to identify Pink Sheets-listed companies with trading volume sufficient to enable TJM to potentially purchase stock directly from the companies and to flip that stock into the public market within thirty days while at least recovering TJM's initial investment.

27.    At Kahlon's direction, independent contractors to TJM located outside of Texas phoned the companies that were identified.

28.    A subset of the identified companies expressed interest in raising capital and scheduled a phone call with Gurin.

29.    At Kahlon's direction, Gurin explained to these companies that TJM could invest up to $1 million in a company in exchange for stock.

30.    If a company was willing to move forward with a transaction, Kahlon or someone acting at his direction prepared a term sheet, subscription agreement and other documents necessary to effectuate an unregistered sale of stock from the company to TJM.  Among other things, the subscription agreements provided for the dollar amount to be paid to the issuer and the number of shares of the issuer's common stock to be provided to TJM.

31.    For each purchase of shares from an issuer, Kahlon signed a subscription agreement and term sheet on behalf of TJM.

32.    For each purchase of shares from an issuer, Gurin emailed the subscription agreements and term sheets to the company selling stock to TJM.

33.    TJM's business model was predicated on acquiring blocks of stock from issuers in multiple successive transactions at a price of at least 40% less than the prevailing market price and reselling the stock into the public market without registration as quickly as possible at a profit.

34.    Generally, within one month of acquiring shares in the Issuers' stock, TJM resold the shares into the public market at the prevailing market price, generating large returns. Typically, Kahlon or someone acting at his direction then prepared additional term sheets and

6

subscription agreements and purchased additional shares from the issuers which were promptly resold into the public market.

35.    Between 2005 and 2010, Kahlon and TJM have effectively acted as conduits for the unregistered transfer of stock from penny stock issuers to the public, including but not limited to the following offerings:

| Issuers | Date of First Offering Analyzed | Date of First Resale to Public | # of Offerings to TJM | Number of shares bought and sold | Profits | % Gain |
|---|---|---|---|---|---|---|
| My Vintage Baby, Inc. | 6/4/08 | 6/5/08 | 25 | 482,064,823 | $550,772 | 99% |
| Lecere Corporation | 7/23/09 | 7/28/09 | 18 | 4,208,550,124 | $802,739 | 131% |
| Landstar, Inc. | 3/27/09 | 4/14/09 | 10 | 781,194,191 | $714,370 | 77% |
| Hard to Treat Diseases, Inc. | 5/6/09 | 5/8/09 | 14 | 1,403,918,020 | $1,508,818 | 157% |
| Good Life China Corporation | 5/15/08 | 5/19/08 | 7 | 1,059,346,317 | $253,229 | 79% |
| VIPR Industries, Inc. | 5/20/09 | 5/22/09 | 31 | 2,054,236,427 | $1,162,189 | 109% |
| ChromoCure, Inc. | 8/25/09 | 8/26/09 | 22 | 5,061,180,974 | $753,912 | 96% |
| Atlantis Internet Group Corp | 9/29/09 | 10/2/09 | 11 | 33,901,341 | $358,088 | 82% |
| Biocentric Energy Holdings, Inc. | 12/4/09 | 12/8/09 | 8 | 134,564,690 | $518,530 | 64% |
| Skybridge Technology Group, Inc. | 1/15/10 | 1/19/10 | 4 | 435,559,439 | $404,623 | 48% |
| RMD Entertainment Group, Inc. | 1/21/10 | 1/25/10 | 6 | 2,963,115,728 | $730,908 | 112% |
| **Total** | | | 156 | 18,617,632,074 | $7,758,178 | |

### The Texas Issuer

36.    My Vintage Baby, Inc. ("My Vintage Baby") – which made children's clothes – never earned a profit and lost hundreds of thousands of dollars per year in 2008 and 2009.

37.    On December 24, 2010, My Vintage Baby announced that its assets had been foreclosed upon by its senior secured lender.

38.    Between June 4, 2008 and September 26, 2009, over the course of twenty-five transactions, TJM purchased 482 million shares of stock from My Vintage Baby for a total price of $555,022.

39.    Within the same time period, TJM resold all 482 million shares of My Vintage Baby into the public market for $1.1 million in sales proceeds, representing a gain of 99%.

40.    TJM's purchases of My Vintage Baby, Inc. stock occurred in the state of Texas.

41.    With regard to the sale of stock from My Vintage Baby, Inc. to TJM in 2008 and 2009, TJM failed to comply with any Texas state law exemption that would allow resale of the shares without an exemption from registration under the Securities Act.

42.    TJM did not purchase the 482 million shares of My Vintage Baby stock solely for its own account.

43.    Between June 4, 2008, and September 26, 2009, TJM bought shares of My Vintage Baby for the account of at least one natural person.

44.    Between June 4, 2008, and September 26, 2009, TJM purchased stock from My Vintage Baby for the benefit of Flomenhaft.

45.    Between June 4, 2008, and September 26, 2009, Flomenhaft transferred money to TJM to purchase shares of My Vintage Baby.

46.    Between June 4, 2008, and September 26, 2009, Kahlon transferred money from TJM to Flomenhaft to distribute to Flomenhaft some of the proceeds of TJM's resale of My Vintage Baby shares into the public market.

47.    No registration statement was in effect and no valid exemption from registration applied to TJM's purchase of stock from My Vintage Baby. No registration statement was in effect and no valid exemption from registration applied to TJM's resale transactions.

48.    Between June 4, 2008, and September 26, 2009, TJM participated in the distribution of MVB shares into the public market.

49.    Kahlon and TJM sold shares of My Vintage Baby to the general public using interstate commerce. New York-based Kahlon and TJM used interstate phone, email, phone and fax to review and execute subscription agreements with My Vintage Baby in Texas; and used interstate faxes and email to communicate with My Vintage Baby's transfer agent in Nevada.

### Foreign Issuers

50.    Since 2005, Kahlon, through TJM, has attempted to invoke Texas securities law and a federal securities registration exemption to purchase hundreds of millions of shares of stock from small issuers in unregistered transactions.

51.    TJM participated in the distribution of the Issuers' shares into the public market.

### A. Lecere Corporation

52.    Between July 2009 and June 2010, TJM bought shares of Lecere Corporation ("Lecere") and resold the shares into the public market when no registration statement was filed or in effect.

53.    TJM's purchase of stock from Lecere between July 2009 and June 2010 did not occur in Texas.

54.    Lecere is a Minnesota corporation formerly based in Naples, Florida. Lecere is currently based in Portland, Oregon. From July 22, 2009 to the present, Lecere has maintained a bank account in Rochester, MN, has conducted business through that account, and has had no substantial offices or operations in the state of Texas.

55.    In July 2009, Flomenhaft phoned Lecere to pitch an opportunity for Lecere to raise $1 million in capital through the sale of Lecere stock.

56.    That month, Flomenhaft scheduled a phone call between Gurin and an officer of Lecere.

57.    At Kahlon's direction, Gurin explained to a Lecere officer the process for selling stock to TJM.

58.    At Kahlon's direction, Gurin referred Lecere to David Kahn, an attorney in California to facilitate the sale of stock by Lecere to TJM.

59.    On at least eighteen occasions, Kahlon or someone acting at his direction prepared a term sheet, subscription agreement and other documents necessary to effectuate an unregistered sale of stock from Lecere to TJM. Kahlon signed these documents on behalf of TJM.

60.    At Kahlon's direction, on at least eighteen occasions, Ed Gurin sent a term sheet and subscription agreement to Lecere for signature by a Lecere officer.

61.    Between July 2009 and June 2010, over the course of eighteen transactions, TJM purchased 4.2 billion shares of stock from Lecere for a total price of $613,159.

62.    Within the same time period, TJM resold all 4.2 billion shares of Lecere into the public market for $1.4 million in sales proceeds, a 131% gain over its initial investment.

63.    TJM did not purchase the 4.2 million shares of Lecere solely for its own account.

64.    TJM bought shares of Lecere for the account of at least one natural person, contrary to the Texas exemption upon which TJM relied.

65.    Between July 2009, and June 2010, TJM purchased shares of Lecere stock on behalf of Flomenhaft.

66.    Between July 22, 2009, and June 8, 2010, Flomenhaft transferred money to TJM to purchase shares of Lecere.

67.    Between July 22, 2009, and June 8, 2010, Kahlon transferred money from TJM to Flomenhaft to distribute to Flomenhaft some of the proceeds of TJM's resale of Lecere shares into the public market.

68.    No registration statement was in effect and no valid exemption from registration applied to TJM's purchase of stock from Lecere.  No registration statement was in effect and no valid exemption from registration applied to TJM's resale of Lecere stock into the public market.

69.    Kahlon and TJM sold shares of Lecere to the general public using interstate commerce.  New York-based Kahlon and TJM used interstate phone, email and fax to review and execute subscription agreements with Lecere in Oregon and Florida; and used interstate faxes and email to communicate with David Kahn in California and Lecere's transfer agent in Denver, Colorado.

**B.  Good Life China Corporation**

70.    Good Life China Corporation is incorporated in Nevada and based in Dongguan City, China.

71.    From May 2008 through October 2009, on at least seven occasions, Kahlon or someone acting at his direction prepared a term sheet, subscription agreement and other

11

documents necessary to effectuate an unregistered sale of stock from Good Life China Corporation to TJM. Kahlon signed these documents on behalf of TJM.

72.    On at least seven occasions, at Kahlon's direction, Gurin emailed a term sheet and a subscription agreement to a consultant to Good Life China Corporation in Canada for signature by an officer or Good Life China Corporation.

73.    From May 2008 through October 2009, TJM bought 1.1 million shares of Good Life China Corporation in seven unregistered offerings for $320,000 and resold all 1.1 million shares of Good Life China Corporation into the public market without registration for proceeds of $573,229, representing a gain of 79% on TJM's initial investment.

74.    TJM's purchase of stock from Good Life China Corporation did not occur in Texas.

75.    No registration statement was in effect and no valid exemption from registration applied to TJM's purchase of stock from Good Life China Corporation.

76.    No registration statement was in effect and no valid exemption from registration applied to TJM's resale of Good Life China Corporation stock into the public market.

77.    Between May 2008 and October 2009, Kahlon, through TJM, purchased Good Life China Corporation shares with a view to distribution.

78.    Between May 2008 and October 2009, Kahlon, through TJM, engaged in a distribution of Good Life China Corporation shares to the public.

### C. VIPR Industries, Inc.

79.    VIPR Industries, Inc. is incorporated in Nevada and conducted business in Nevada.

80.     From May 2009 through June 2010, on at least thirty-one occasions, Kahlon or someone acting at his direction prepared a term sheet, subscription agreement and other documents necessary to effectuate an unregistered sale of stock from VIPR Industries, Inc. to TJM.  Kahlon signed these documents on behalf of TJM.

81.     At Kahlon's direction, on at least thirty-one occasions, Ed Gurin emailed a term sheet and a subscription agreement to VIPR Industries, Inc. in Las Vegas, Nevada for signature by a VIPR Industries, Inc. officer.

82.     From May 2009 through June 2010, TJM bought 2.1 million shares of VIPR Industries, Inc. in thirty-one unregistered offerings for $1.07 million and resold all 2.1 million shares of VIPR Industries Inc. into the public market without registration for $2.23 million, representing a gain of 109% on TJM's initial investment.

83.     TJM's purchase of stock from VIPR Industries, Inc. did not occur in Texas.

84.     No registration statement was in effect and no valid exemption from registration applied to TJM's purchase of stock from VIPR Industries, Inc.

85.     No registration statement was in effect and no valid exemption from registration applied to TJM's resale of VIPR Industries, Inc. stock into the public market.

86.     Between May 2009 and June 2010, Kahlon, through TJM, purchased VIPR Industries, Inc. shares with a view to distribution.

87.     Between May 2009 and June 2010, Kahlon, through TJM, engaged in a distribution of VIPR Industries, Inc. shares to the public.

**D.  Hard to Treat Diseases, Inc.**

88.     Hard to Treat Diseases, Inc. is incorporated in Nevada and based in Shenzhen, China.

13

89.    From May 2009 through July 2010, on at least fourteen occasions, Kahlon or someone acting at his direction prepared a term sheet, subscription agreement and other documents necessary to effectuate an unregistered sale of stock from Hard to Treat Diseases, Inc. to TJM.  Kahlon signed these documents on behalf of TJM.

90.    At Kahlon's direction, on at least thirty-one occasions, Ed Gurin sent a term sheet and a subscription agreement to a Hard to Treat Diseases, Inc. consultant in Canada for signature by a Hard to Treat Diseases, Inc. officer.

91.    From May 2009 through July 2010, TJM bought 1.4 million shares of Hard to Treat Diseases, Inc. in thirty-one unregistered offerings for $1.0 million and resold all 1.4 million shares of Hard to Treat Diseases, Inc. into the public market without registration for $2.5 million, representing a gain of 157% on TJM's initial investment.

92.    Between May 2009 and July 2010, TJM's purchases of stock from Hard to Treat Diseases, Inc. did not occur in Texas.

93.    No registration statement was in effect and no valid exemption from registration applied to TJM's purchases of stock from Hard to Treat Diseases, Inc.

94.    No registration statement was in effect and no valid exemption from registration applied to TJM's resale of Hard to Treat Diseases, Inc. stock into the public market.

95.    Between May 2009 and July 2010, Kahlon, through TJM, purchased Hard to Treat Diseases, Inc. shares with a view to distribution.

96.    Between May 2009 and July 2010, Kahlon, through TJM, engaged in a distribution of Hard to Treat Diseases, Inc. shares to the public.

**E.  Landstar, Inc.**

97.    Landstar, Inc. is incorporated in Nevada and based in Beijing, China.

98.    From March 2009 through July 2010, on at least ten occasions, Kahlon or someone acting at his direction prepared a term sheet, subscription agreement and other documents necessary to effectuate an unregistered sale of stock from Landstar, Inc. to TJM. Kahlon signed these documents on behalf of TJM.

99.    At Kahlon's direction, on at least ten occasions, Ed Gurin emailed a term sheet and a subscription agreement to a Landstar, Inc. consultant in Canada for signature by a Landstar, Inc. officer.

100.    From March 2009 through July 2010, TJM bought 781 million shares of Landstar, Inc. in multiple unregistered offerings for $925,000 and resold all 781 million shares of Landstar, Inc. into the public market without registration for $1.6 million, representing a gain of 77%.

101.    TJM's purchase of stock from Landstar, Inc. did not occur in Texas.

102.    No registration statement was in effect and no valid exemption from registration applied to TJM's purchase of stock from Landstar, Inc.

103.    No registration statement was in effect and no valid exemption from registration applied to TJM's resale of Landstar, Inc. stock into the public market.

104.    Between March 2009 and July 2010, Kahlon, through TJM, purchased Landstar, Inc. shares with a view to distribution.

105.    Between March 2009 and July 2010, Kahlon, through TJM, engaged in a distribution of Landstar, Inc. shares to the public.

**F. ChromoCure, Inc.**

106.    ChromoCure, Inc. was incorporated in Nevada and operated in Nevada.

107.    From August 2009 through March 2010, on at least twenty-two occasions, Kahlon or someone acting at his direction prepared a term sheet, subscription agreement and other

documents necessary to effectuate an unregistered sale of stock from ChromoCure, Inc. to TJM. Kahlon signed these documents on behalf of TJM.

108.    At Kahlon's direction, on at least twenty-two occasions, Ed Gurin emailed a term sheet and a subscription agreement to ChromoCure, Inc. for signature by a ChromoCure, Inc. officer.

109.    From August 2009 through March 2010, TJM bought 5.1 million shares of ChromoCure, Inc. stock in multiple unregistered offerings for $785,000 and resold all 5.1 million shares into the public market without registration for $1.5 million representing gains of 96%.

110.    TJM's purchase of stock from ChromoCure, Inc. did not occur in Texas.

111.    No registration statement was in effect and no valid exemption from registration applied to TJM's purchase of stock from ChromoCure, Inc.

112.    No registration statement was in effect and no valid exemption from registration applied to TJM's resale of ChromoCure, Inc. stock into the public market.

113.    Between August 2009 and March 2010, Kahlon, through TJM, purchased ChromoCure, Inc. shares with a view to distribution.

114.    Between August 2009 and March 2010, Kahlon, through TJM, engaged in a distribution of ChromoCure, Inc. shares to the public.

### G. Atlantis Internet Group Corp

115.    Atlantis Internet Group Corp is incorporated and based in Nevada.

116.    From September 2009 through February 2010, on at least eleven occasions, Kahlon or someone acting at his direction prepared a term sheet, subscription agreement and other documents necessary to effectuate an unregistered sale of stock from Atlantis Internet Group Corp to TJM.  Kahlon signed these documents on behalf of TJM.

117.    At Kahlon's direction, on at least eleven occasions, Ed Gurin emailed a term sheet and a subscription agreement to Atlantis Internet Group Corp. for signature by an officer of Atlantis Internet Group Corp.

118.    From September 2009 through February 2010, TJM bought 33.9 million shares of Atlantis Internet Group Corp in eleven unregistered offerings for $435,791 and resold all 33.9 million shares into the public market without registration for $793,879, representing gains of 82%.

119.    TJM's purchase of stock from Atlantis Internet Group Corp did not occur in Texas.

120.    No registration statement was in effect and no valid exemption from registration applied to TJM's purchase of stock from Atlantis Internet Group Corp.

121.    No registration statement was in effect and no valid exemption from registration applied to TJM's resale of Atlantis Internet Group Corp stock into the public market.

122.    Between September 2009 and August 2010, Kahlon, through TJM, purchased Atlantis Internet Group Corp. shares with a view to distribution.

123.    Between September 2009 and August 2010, Kahlon, through TJM, engaged in a distribution of Atlantis Internet Group Corp. shares to the public.

**H.  Biocentric Energy Holdings, Inc.**

124.    Biocentric Energy Holdings, Inc. is incorporated in Florida and conducted business in California.

125.    From December 2009 through April 2010, on at least eight occasions, Kahlon or someone acting at his direction prepared a term sheet, subscription agreement and other

documents necessary to effectuate an unregistered sale of stock from Biocentric Energy Holdings, Inc. to TJM.  Kahlon signed these documents on behalf of TJM.

126.    At Kahlon's direction, on at least eight occasions, Ed Gurin emailed a term sheet and a subscription agreement to Biocentric Energy Holdings, Inc. for signature by an officer of Biocentric Energy Holdings, Inc.

127.    From December 2009 through April 2010, TJM bought 134.6 million shares of Biocentric Energy Holdings, Inc. in eight unregistered offerings for $810,000 and resold all 134.6 million shares into the public market without registration for $1.3 million, representing gains of 64%.

128.    TJM's purchase of stock from Biocentric Energy Holdings, Inc. did not occur in Texas.

129.    No registration statement was in effect and no valid exemption from registration applied to TJM's purchase of stock from Biocentric Energy Holdings, Inc.

130.    No registration statement was in effect and no valid exemption from registration applied to TJM's resale of Biocentric Energy Holdings, Inc. stock into the public market.

131.    Between December 2009 and April 2010, Kahlon, through TJM, purchased Biocentric Energy Holdings, Inc. shares with a view to distribution.

132.    Between December 2009 and April 2010, Kahlon, through TJM, engaged in a distribution of Biocentric Energy Holdings, Inc. shares to the public.

**I.  <u>RMD Entertainment Group, Inc.</u>**

133.    RMD Entertainment Group, Inc. is incorporated in Nevada and is based in Beijing, China.

134.    From January 2010 through March 2010, on at least six occasions, Kahlon or someone acting at his direction prepared a term sheet, subscription agreement and other documents necessary to effectuate an unregistered sale of stock from RMD Entertainment Group, Inc. to TJM.  Kahlon signed these documents on behalf of TJM.

135.    At Kahlon's direction, on at least six occasions, Ed Gurin emailed a term sheet and a subscription agreement to RMD Entertainment Group, Inc. for signature by an officer of RMD Entertainment Group, Inc.

136.    From January 2010 through March 2010, TJM bought 3.0 million shares of RMD Entertainment Group, Inc. in six unregistered offerings for $650,000 and resold all 3.0 million shares into the public market without registration for proceeds of $1.4 million, representing gains of 112%.

137.    TJM's purchase of stock from RMD Entertainment Group, Inc. did not occur in Texas.

138.    No registration statement was in effect and no valid exemption from registration applied to TJM's purchase of stock from RMD Entertainment Group, Inc.

139.    No registration statement was in effect and no valid exemption from registration applied to TJM's resale of RMD Entertainment Group, Inc. stock into the public market.

140.    Between January 2010 and March 2010, Kahlon, through TJM, purchased RMD Entertainment Group, Inc. shares with a view to distribution.

141.    Between January 2010 and March 2010, Kahlon, through TJM, engaged in a distribution of RMD Entertainment Group, Inc. shares to the public.

**J.  Skybridge Technology Group, Inc.**

142.    Skybridge Technology Group, Inc. is incorporated and based in Nevada.

143.     From January 2010, through February 2010, on at least four occasions, Kahlon or someone acting at his direction prepared a term sheet, subscription agreement and other documents necessary to effectuate an unregistered sale of stock from Skybridge Technology Group, Inc. to TJM.  Kahlon signed these documents on behalf of TJM.

144.     At Kahlon's direction, on at least four occasions, Ed Gurin emailed a term sheet and a subscription agreement to a consultant to Skybridge Technology Group, Inc. in Canada for signature by an officer of Skybridge Technology Group, Inc.

145.     From January 2010, through February 2010, TJM bought 435.6 million shares of Skybridge Technology Group, Inc. in four unregistered offerings for $850,000 and resold all 435.6 million shares of Skybridge Technology Group, Inc. into the public market for $1.3 million, representing gains of 47%.

146.     TJM's purchase of stock from Skybridge Technology Group, Inc. did not occur in Texas.

147.     No registration statement was in effect and no valid exemption from registration applied to TJM's purchase of stock from Skybridge Technology Group, Inc.

148.     No registration statement was in effect and no valid exemption from registration applied to TJM's resale of Skybridge Technology Group, Inc. stock into the public market.

149.     Between January 2010 and February 2010, Kahlon, through TJM, purchased Skybridge Technology Group, Inc. shares with a view to distribution.

150.     Between January 2010 and February 2010, Kahlon, through TJM, engaged in a distribution Skybridge Technology Group, Inc. shares to the public.

151.     Texas securities law did not apply to initial offerings by the Issuers to TJM because those offerings did not occur in Texas.

## CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act

152.    Paragraphs 1 through 151 are re-alleged and incorporated by reference as if fully set forth herein.

153.    Defendants directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and sell securities through the use or medium of a prospectus or otherwise when no registration statement had been filed or was in effect as to such securities and no exemption from registration was available.

154.    By reason of the activities described herein, Defendants, singly or in concert, directly or indirectly, have violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief:

### I.

Permanently enjoin and restrain Defendants from, directly or indirectly, engaging in conduct in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

### II.

Order Defendants to disgorge their ill-gotten gains, on a joint and several basis, plus prejudgment interest thereon.

21

## III.

Order Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)].

## IV.

Impose a bar on Defendants from participating in an offering of penny stock pursuant to Securities Act Section 20(g) [15 U.S.C. § 77t(g)].

## V.

Grant such other and further relief as this Court may deem just, equitable and necessary.

## JURY DEMAND

The Commission hereby requests a trial by jury.

Dated: August 14, 2012

Respectfully submitted,

**THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

TOBY M. GALLOWAY

Toby M. Galloway
Local Counsel
Texas Bar No. 00790733
801 Cherry Street, 19th Floor
Fort Worth, Texas 76102-6803
Tel.: (817) 978-6447
Fax: (817) 978-4927
Email: GallowayT@sec.gov

Timothy Leiman
Lead Attorney
Illinois Bar No. 6270153
175 West Jackson Boulevard, Suite 900
Chicago, Illinois 60604

22

(312) 353-5213
Fax: (312) 353-7398
Email: LeimanT@sec.gov

John E. Birkenheier
Attorney for Plaintiff
Illinois Bar No. 6270993
175 West Jackson Blvd, Suite 900
Chicago, Illinois 60604
Phone: (312) 886-3947
Fax: (312) 353-7398
E-mail: BirkenheierJ@sec.gov

Lori Jacobs
Attorney for Plaintiff
Illinois Bar No. 6293998
175 West Jackson Blvd, Suite 900
Chicago, Illinois 60604
Phone: (312) 886-3947
Fax: (312) 353-7398
E-mail: JacobsL@sec.gov

23

# EXHIBIT C

SHORT FORM ORDER

SUPREME COURT - STATE OF NEW YORK

Present:

**HON. STEPHEN A. BUCARIA**

Justice

---

|  |  |
|---|---|
| TJ MANAGEMENT GROUP LLC, | TRIAL/IAS, PART 1<br>NASSAU COUNTY |
| Plaintiff, | INDEX No. 011405/12 |
| -against- | MOTION DATE: Nov. 9, 2012<br>Motion Sequence # 001 |
| JOSHUA SASON, MAGNA GROUP, LLC<br>and MAGNA GROUP (TEXAS) LLC, |  |
| Defendants. |  |

---

The following papers read on this motion:

       Notice of Motion....................................... X
       Affirmation in Opposition.......................... X
       Reply Affidavit.......................................... X
       Memorandum of Law................................. X

Motion by defendants to dismiss the complaint for failure to state a cause of action is **granted**.

Plaintiff TJ Management Group LLC is a limited liability company that was engaged in private equity trading. It appears that TJ Management's method of doing business was to acquire large blocks of stock in small companies at discounted prices and resell the stock in the public market without registering the securities. Beginning in May 2007, TJ Management sold the stock through E*Trade Securities.

Plaintiff alleges that on January 27, 2010 defendant Joshua Sason formed a Texas

1

**TJ MANAGEMENT GROUP, LLC v SASON, et al**          **Index no. 011405/12**

limited liability company, defendant Magna Group (Texas) LLC, to copy TJ Management's "business model." Magna Group (Texas) then engaged in similar transactions and utilized E*Trade Securities as its broker. On April 18, 2011, E*Trade closed TJ Management's account, allegedly in response to the dumping of 320,000 shares of a penny stock by Magna Group (Texas).

On August 14, 2012, the Securities and Exchange Commission filed a civil enforcement action against TJ Management, and its managing member Yossef Kahlon, in the United States District Court for the Eastern District of Texas. Plaintiff alleges that the SEC enforcement proceeding was also precipitated by defendants' conduct.

On September 7, 2012, plaintiff commenced this action against Sason, Magna Group, LLC, and Magna Group (Texas). Plaintiff characterizes its complaint as stating a claim for tortious interference with plaintiff's contractual and business relationships with E*Trade (Aff of Norman Heller at ¶ 8).

Defendants move to dismiss the complaint for failure to state a cause of action. In opposition to the motion, plaintiff asserts a need to depose Sason in connection with the SEC enforcement proceeding (Aff of Norman Heller at ¶ 6).

"On a motion to dismiss pursuant to CPLR 3211, the pleading is to be afforded a liberal construction....[The court must] accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory"(*Arnav Industries, Inc. v. Brown*, 96 NY2d 300, 303 [2001]).

Where there has been no breach of an existing contract, but only interference with prospective economic relations, plaintiff must show "more culpable conduct," such as physical violence, fraud or misrepresentation, abuse of process, or economic pressure (*Carvel Corp. v Noonan*, 3 NY3d 182, 191 [2004]). Persuasion alone is not sufficient (Id). The conduct must be directed not at the plaintiff itself, but at the party with whom plaintiff has or seeks to have a business relationship (Id at 192).

The culpable conduct which plaintiff alleges that defendants engaged in is the distribution of unregistered securities. However, plaintiff does not allege that defendants exerted economic pressure, or engaged in any conduct directed at E*Trade, to force it to

2

**TJ MANAGEMENT GROUP, LLC v SASON, et al**                    Index no. 011405/12

cease doing business with TJ Management.  Thus, plaintiff has not alleged a legally sufficient claim for tortious interference with prospective economic relations.  Defendants' motion to dismiss the complaint for failure to state a cause of action is **granted**.

So ordered.

Dated    JAN 1 0 2013

XXX                                      _J.S.C._

ENTERED
JAN 1 4 2013
NASSAU COUNTY
COUNTY CLERK'S OFFICE

3